Now turn to the first case of the morning, Association of New Jersey Rifle and Pistol Clubs v. Attorney General of New Jersey, together with some other cases, appellate numbers 24-2415, 24-2450, and 24-2506. Ms. Murphy. Good morning, Your Honors, and may it please the Court, Erin Murphy on behalf of the ANJ RPC and Ellman plaintiffs. We'll be dividing time today. I'll be taking ten minutes, Mr. Bergstrom will take five. And if I may, I'd like to reserve three minutes for rebuttal. I'd be granted. Thank you. Millions of law-abiding Americans own the semi-automatic rifles, pistols, and shotguns that New Jersey has forbidden, and millions more own the magazines that it has prohibited. That forecloses the state's effort to ban them, as the Supreme Court has been emphatic that our historical tradition is one of protecting the right to possess arms that are in common use for lawful purposes today. Ms. Murphy, before we delve into the important constitutional issues presented in this case, I have a probably minor procedural question, but I assume I'm correct that there were actually three separate actions here that ended up being consolidated for appeals purposes. That's correct. And along the way in the district court, and I don't want to waste time by getting into details of the three different actions, but what emerged was eventually a challenge only to the AR-15, even though I believe there were broader challenges in at least one or several of the underlying actions, and the LCMs. Am I correct? So that is what the district court concluded. We very much dispute and are appealing the proposition that we challenged only the AR-15, because our challenge was to the entirety of the so-called assault weapons ban. Okay, so we may get into that then in greater detail downstream, but just wanted to be clear on that. Thank you very much. Yep, absolutely, absolutely. And that's right where I wanted to start, which is we think the district court got this exactly right as to the court referred in particular to the COLT AR-15 provision. Does that apply, though, to all of the weapons defined under the assault firearms definition? The logical conclusion of the reasoning that was embraced below is that the court should have held the entirety of the law unconstitutional. Do we need to remand, or can we decide that? I think you can decide it. You're certainly welcome to ask Mr. Fagin on his views on this, but I take it to be kind of common ground that at least as to the rifles, I think we all agree that we focus. There was a fair amount of focus on AR-15 rifles, but that's because they're sort of an exemplar of the particular features of rifles that are singled out in the law. Well, then if they are just a particular exemplar, how could we not remand and have an appropriate record made as to all of the so-called assault rifles covered in the New Jersey law? Because all of them have the same basic features that the district court found to be things that you can't ban. But don't you at least have to have findings made to reach that conclusion? They have all of those same functions and parts and whatever. So I don't think you do because of the regulation. And I want to be clear. I mean, I have some separate things I want to say about the shotguns and pistols that are banned because that's a different issue. But as to the rifles, we have a regulation from the state that says, here's the features that we have seen, you know, because there's a component. There's a part of this law that lists 60-some firearms. And then there's another part that says substantially identical. And so there's a regulation that are guiding lines that were put out basically to say, here's what makes something substantially identical to the things that are the rifles that are on the list. It sounds to me like a trial that could take forever if you went into the implications not only of the 67, but every variation that would be possible. And that's why I don't think that's really actually the sensible way to proceed here. I think the better way to look at it is, what is the class of firearms that the state has said it can ban? What are the qualities? In the same way, if you look at Heller, you know, nobody said, well, what particular handgun does Mr. Heller want? And we need to figure out which handguns are and are not prohibited because the class. But Heller was a much different situation than here, right? It's the one case we do have where we are talking about a single type of firearm, a handgun, right? Sure. But here, I think the state has identified a particular type of rifle that it thinks is problematic. A semi-automatic rifle with the capacity to accept a detachable magazine and two of five enumerated features. Your client, if I recall correctly, and it might be buried in a footnote, regards the term assault rifle itself as a pejorative. Absolutely. But we're not focused on, you know, we're focused on what the law says. And the law, setting aside labels, the law identifies specific firearms. And New Jersey has taken a position on what the features of those firearms are that it thinks takes them outside the protection of the Second Amendment. So is that everything defined in the assault firearms definition in the New Jersey Code? So it's different as to rifles, pistols, and shotguns. So which are you challenging? It's the only, you're challenging all of them. We are challenging all of them. They're finding it in the district court on the pistols and the shotguns. So we put in a bunch of evidence about pistols and shotguns, and the district court just kind of said we didn't. Well, it's hard for me to fault the district court for that when the briefing was all about the AR-15. With respect, I mean, we actually talked about both. We have a plaintiff whose standing is based on wanting a shotgun, not a rifle. We have experts who put in testimony about not just ARs. You have to remand. I think, you know, on ARs, you don't. But as to the rest of it, I really don't think you do. But the district court complained about the lack of record here, didn't she? Sure, but there is a record. And I think this court can look at the record and recognize the district court was just mistaken. There is a record. We put on a record. We put in evidence. How can you say, well, when the decision maker says, not one way or another how the decision maker would rule. But I just haven't been provided sufficient evidence here to rule. And I think it's this court's obligation to look at the record and determine whether district court was right about that. And I point you as a great starting point to JA 340 through 351, where our expert talks first. Here's qualities of ARs. Here's qualities of AKs. Here's qualities of shotguns. Here's qualities of pistols. We put on a record about all of these things. So the district court can't eliminate our challenge by saying we didn't create a record when we did. And when we have plaintiffs who particularly wanted other types of arms. And you pled a facial challenge, am I right? We pled a facial challenge. Our complaint very clearly said we were challenging the law in its entirety. Again, we have individual plaintiffs who want rifles. We had an individual plaintiff who specifically wants the shotgun. And we have an expert who went, we made sure that our expert covered each category of firearms that we were challenging. Would you dispute, and I do not claim to have read all of the voluminous record in this case myself. But would you agree that nearly all of the evidence that you presented on the record before the district court related only to the AR-15? No, I would not agree with nearly all. I would certainly grant you that there was a fair amount of focus on the AR-15. Not a large majority was about the AR-15. If you look actually at our expert evidence, a lot of it is not. We did. It's not specifically talking about ARs. It's just not. So I respectfully have to disagree about that in terms of the record. Now, I will grant you that a lot of the argument focused on ARs. But that's because, and I really do think this is common ground, that the AR is kind of an exemplar as to the rifles. I don't think the state, you know, the state's never suggested there's some other rifles on this list that have fundamentally different features that even if an AR ban is unconstitutional, we could still ban these. And since our position is that all of these are arms within the scope of the Second Amendment at the threshold textual level, it's really out in the state's obligation if they think there's some reason that other rifles should be treated differently than ARs to say why. And I don't understand them to have ever made any argument that there's anything on that list that they would say, well, even if the AR bans unconstitutional. Let's move to the, let's move to the text.  At what step of Bruin does, should the court consider the concept of common use? Step one or step two? Step two, common use. And what is your reasoning? And I say that because it appears that the other circuits seem to have looked at this, seem to be largely focused at step one. Tell me your reason as succinctly as you can. Sure, it follows from Bruin, directly from Bruin. For I think the two principal reasons that follows from Bruin are first, the way Bruin did the textual analysis, and second, the way Bruin did the historical tradition analysis. So to start with the first one, when Bruin was doing the textual analysis about carrying, about the question there was carrying in public. The textual analysis, the court said, look, carrying a firearm clearly fits within the meaning of bear. And the text doesn't draw a distinction between the home and the public places. And that's enough for purposes of the textual inquiry. The court said, that's it. If there is a historical, if there's a distinction to be drawn based on home versus private, it's not found in the text, so we have to draw it from historical tradition. So that's the first, in the same way, if you look at the text here, the text doesn't say there's a right to keep and bear arms that are in common use. It says to keep and bear arms. And so that's not to say... Didn't Heller tell us that the right is the right to self-defense? And don't we have to, in light of that, Bruin, that's what, sorry, that's what Heller told us, that we have to look at common use, the right being defined by the common use for self-defense, because that's what the right covers? Sure, you look at that at the historical tradition stage. And Heller said, both Heller and Bruin specifically used that language, and this is my second point about Bruin. Bruin talked about the common use tradition, and the first place it talked about it was when it was providing an example of how to do historical tradition analysis. The court pointed to that and said, in Heller, for example, we found it fairly supported by the, quote, historical tradition of prohibiting the carrying of dangerous and unusual weapons, that the Second Amendment protects possession and use of weapons that are in common use at the time. But from that perspective, then, doesn't it mean that, from your point of view, and I think this is how the briefing reads on your side, is all arms are protected under the Second Amendment, plain text, all arms. And if that's the case, why did Heller even talk about, well, M16s might be prohibited? All arms are presumptively protected. M16s are firearms. They are presumptively protected. That doesn't mean they're ultimately protected. Historical tradition comes in. The in common use test matters. It determines the ultimate question of whether something is- Ultimate being what is determined after going through step two of Bruin? Exactly. Whether what restrictions you can place, and which arms could be prohibited, what carrying could be prohibited. So, sure, a firearm is a firearm. But all the first step of Bruin is about is just determining whether the Second Amendment is implicated at all, such that the state should have to carry its burden. As an arm. As an arm. And it seems to me pretty extraordinary to suggest that a ban on firearms literally doesn't implicate the Second Amendment. I mean, that is the state's position, that it doesn't implicate it. You don't need to engage in historical tradition analysis. And I think Rahimi is actually pretty helpful on this, too. Because when the Supreme Court in Rahimi did the textual inquiry, the way they described it is, as long as a law burdens arms, regulates. As long as a law regulates, quote, arms bearing conduct, we move past the threshold stage and engage in historical tradition analysis. The burden shifts to the government. But that means, from your point of view, the word arm means all arms. Arms means exactly what Heller said. All instruments that constitute bearable arms. Instruments that facilitate self-defense. Instruments that you can take into your hands and use to cast at or strike another. A firearm clearly fits that definition of arms. Again, that doesn't, you know, that's just what tells you you have to do historical tradition. It doesn't end the analysis at all. And as I read Heller, what the court said there is the reason that M-16s and the like could be banned is because of the historical tradition of dangerous and unusual. Understood. Let me see if Judge Freeman has some questions for you. So, setting aside whether we consider common use at step one or step two, is it your position that the court needs to look at the use, the common use of the challenged, of the weapons at the time when the petition is brought or at the time of the evidence you're hearing in the case? And that, so if something becomes commonly used, you know, tomorrow, and then there's a hearing, then it's protected by the second amendment. But then if it falls out of vogue, what happens then? Is it no longer protected? So, to start with, kind of, if something can become common, and Bruin very directly answered that question. Bruin specifically dealt with, they said, even if these, you know, even if handguns were considered dangerous and unusual at the founding, they're not today. And that's what controls. So, I think, absolutely, you know, the court already confronted this and said, yes, the consequence of that test is things could become protected. I think it makes more sense to say that means they can't, kind of, like, lose protection just because they become, you know, a little bit outmoded or outdated. But certainly that's not particularly relevant for purposes of this case because, you know, we want to buy, my clients would like to have arms that are still the types of arms that you can purchase and use today. And nobody's suggesting that they've, kind of, fallen out of favor and stopped being used. What if something comes into common use that also could be considered dangerous? So, I think the point of the common use test is to say that as between letting the government versus the people decide what is too dangerous or abnormally dangerous to be suited for common defense. Common for self-defense. We let the people make that determination. The people who are actually using firearms for self-defense. They speak with their voice by, you know, by obtaining arms, keeping and bearing arms. Talk to people through their legislative body when you're talking about, well, I just want to make sure I understand. You're talking about the people who are gun owners, users, possessors. Yes, you need to focus on people who actually, you know, are keeping and bearing arms. And what popularity test would determine the scope of the right? I think a popularity test is the way you're effectuating the framers' judgment that as between the government and the people making that choice, we trust the people. Can we even, I'm sorry, go ahead. There were shoulder rocket launchers. The same number of people have AR-15s own shoulder rocket launchers. Are you saying that that is unregulatedly relatable? I mean, Justice Thomas just said he's dealt with exactly this in his Dissent from Denial in the Show. Asking you your thoughts on it. And I think what he said is exactly right. Sure, as a theoretical matter, that is true. But as a practical matter, we have 250 years of experience in this country. And the people have never clamored to own things that are patently unsuitable for self-defense. People don't try to buy rocket launchers. So that's the test, is whether or not the item is patently unusable for self-defense. No, the test is common use. And the people. Let's focus on the word common, though. Because it pops up. It is inevitably encountered as we go through this analysis. Number one, has the Supreme Court told us what common means in the context of the Second Amendment? They have not specifically defined the contours of what is and is not common. How do you maintain we should determine commonality? Forgive me for using a term usually employed in class actions. But how do we determine commonality? Sure. So I want to be clear. There's two components to the common use test. It's not just possession. It's possession for lawful purposes like self-defense. So you have to look at both the numbers and the reasons and uses, you know, what people possess something for. But I think you do start with the numbers. You look at, you know, how many people own this. That's certainly how Justice Alito and I think Justice Thomas joined him and Catano focused on it. The recent decisions from Justice Kavanaugh and Justice Thomas and Snope indicate, you know, you do start with numbers. And are these something that is possessed by a significant number of people? Sure. As in any test that's not a bright line, it's going to be hard to draw exactly where you start and finish. But I don't think in this case that's particularly hard when you're talking about magazines that account for 50 percent of the magazines out there and the second most popular type of firearm in the country behind a handgun. You know, we're talking about tens of millions. When it comes to magazines, perhaps, you know, hundreds of millions of these in common circulation. And so wherever the line is, I think you can save that for a case where it's a closer call. But I also do think the use is important. So if you take something like the very small number of semi-automatic firearm, I'm sorry, of fully automatic firearms that are lawfully owned, which actually is in the hundreds of thousands, not that 750,000 number some courts have thrown around. Nobody's ever put together the record on this. But as a legal matter, a lot of those are going to be owned as collector's items, not something that's being actually used. And whether that kind of counts is, you know, I'm not sure that really counts as the type of use that matters. In your last comment, you implicitly raised a question that I've had in preparing for this case. And that is, and it goes to the commonality question. There is a significant amount of survey research, if we can call it that, of statistics throughout. How dependable do you consider that survey research to have been? Because some of it is criticized, but it frequently appears in the briefing. Yeah, I think it is, you know, as with any survey, you're going to have a margin of error. But here, whatever the margin of error is, the numbers are so far beyond what I would think of as the kind of where you might think the threshold for commonality is. That if it's off by, you know, it's 20 million, not 25 million, or the magazines are 150 million, not 175, I don't think that's a material difference. You can certainly quibble about this, but I don't take the state to be saying these numbers are so radically far off. It's really only like, you know, 50,000 people who own these firearms. They're quibbling about whether it's 15 million versus 12 million versus 18 million. And, you know, of course, you can always quibble around the edges about statistics, especially when they're things that have been pulled through surveys. I don't think any of those distinctions end up being material. The old Churchillian, there are lies, damn lies, and statistics. Yeah, but, you know, if you're going to have a test where the goal is to determine to allow the people to speak with their own voice about what they believe is suited for their common defense, their self-defense, you know, you're going to have to have a way to effectuate that test. And I'm not really sure how else you can effectuate that test than by trying to find out what it is that the people actually keep and bear and use for self-defense and hunting and target shooting and all of the uses that the framers and the founding generation would have understood to be the uses that you want people to have familiarity with, with the arms that you would expect them to muster with if called to the militia. Judge Freeman. Yeah, so, you know, Heller uses the language dangerous and unusual, but some earlier sources use the phrase dangerous or unusual. So which is it? And, you know, assuming that common use equates to usual, so not unusual, could weapons that are nonetheless dangerous still be regulated? So we think it is both. You have to be both dangerous and unusual. That is the way Heller put it. That is the way that multiple Supreme Court justices, the ones who have actually opined on this, have said that is the correct reading of Heller. That's the way Bruin put it. And the court has consistently focused on not just that language, but particularly saying the reason in Heller, I mean, the ultimate question in Heller was whether the handgun ban was constitutional. And the reason the court said it was unconstitutional is because handguns are in common use for self-defense. They didn't engage in some distinct analysis of, well, we know they may be the quintessential weapon, but we've got to independently analyze whether they are somehow too dangerous to be in the hands of the people. They said it's enough. You just said too dangerous. I'm not sure what that means, but I was going to ask you, why do we talk about dangerous and unusual weapon? Who wants a weapon that isn't dangerous? So, and this is why I think that... Seems a real redundancy at best. So I think the only kind of, for precisely that reason, for dangerous to mean anything, I think dangerous has to mean dangerous in a way that differentiates it from common arms. So if you take the example of, you know, like the kind of the flamethrower, the bazooka, the types of things that people always hypothesize, oh, no, people might choose these, and then somehow they become protected. You know, the reason people don't choose things like that is because people generally don't want arms that inherently pose a high risk of collateral damage. You don't, you know, the average person, I'm not saying there's no one out there, but this is a commonality test, and the average person, they don't want to risk harming their loved ones, destroying the property they're trying to protect. That's why people choose arms like the AR-15, because it's actually extremely accurate and less likely, even than handguns, with the right ammunition to penetrate walls and perhaps hit your family that is hiding in the next room or whatever it may be. People consistently choose arms that don't pose that inherent risk of a high degree of collateral damage, even when used properly. And I think that's how, you know, to me, for dangerousness to have any real work to do in a dangerous and unusual test, it has to be focused on dangerous, not in the way that, of course, arms are dangerous. The point of arms is that you're using them to inflict force against another person. That can't be the test, or it's pointless. Every arm is dangerous, and I think it makes sense to say, is it dangerous in a way that differentiates it. I think some of the original sources of this dangerous or unusual language are talking about the, you know, riding or going armed laws, and they prohibited, you know, going armed with dangerous or unusual weapons. Clearly, the person who was going armed with that weapon didn't think it was too dangerous. But the, you know, the legislative body did. I'm actually not sure, you know, that's not as clear to me, because I take those laws to be focused on trying to stop people who were carrying arms for what were perceived to be improper purposes, that they were not carrying them for their defense. They were carrying the types of arms. A lot of those laws refer to kind of the offensive or aggressive use, and I think what they're getting at is people who are carrying arms for a different purpose than just to protect themselves. So I think they're getting at the concept of not just arms that are, you know, not people who are carrying for self-defense, arms that the government has decided aren't suited for self-defense, but instead people who are carrying the type of arms. They're using them to the terror of the people rather than just to protect themselves. All right. Counsel, we'll hear you back on rebuttal. Thank you. Thank you, Your Honor. May it please the court, Will Bergstrom for the Cheeseman Plaintiffs. I'd like to pick up where Ms. Murphy left off about the concept of dangerousness. I agree with her that what we're talking about in this case, whether or not dangerous and unusual is a conjunctive test or separate element. I think the Supreme Court has only ever used it as a conjunctive test, but really it doesn't matter here because what we're looking at, what we're comparing the dangerous arm against is arms in common use. An arm that's in common use cannot be dangerous. And another hint, I think, for why we can't look at— Common use can't be dangerous? Is that what I heard you say? That's correct, Your Honor, because we're asking if they are more dangerous than arms that are in common use. So if an arm is in common use, it's obviously not more dangerous than arms that the American people— Or you just modify dangerous by saying more dangerous. Well, right, because, Your Honor, I think this goes to your initial question to Ms. Murphy. It is not dangerous in say, in itself? Well, it is dangerous. All weapons are dangerous. They're intended to be dangerous. But the question is, is it dangerous and unusual, right? That's the question we have to be answering, or dangerous or unusual. And which step are we looking at this, by the way? Are we looking at that from the first step or the second step of Bruin? This is at the second step of Bruin, because— So all arms, regardless of level of dangerousness, regardless of whether it's dangerous or unusual, dangerous and unusual, doesn't matter. It's a covered arm. We move to step two. That's correct, Your Honor. What's your authority for that? Heller says when it defined arms, it did not look at commonality at all when it was looking at the definition of arms. It didn't look at common use for self-defense? Wasn't that the language? In part three of Heller, when it was discussing historical limitations on the right, it began looking at common use. But when it was defining what arm meant in the context of the Second Amendment, it even noted that the most restrictive founding-era definition of that term it could find at least included all firearms. Is any arm prohibited just on the plaintext of the Second Amendment? Or is every arm covered? Every arm is presumptively protected. Then the burden shifts. Correct. Then the state carries the burden of proving that there is a historical tradition of regulation that provides a basis on which they can regulate an arm. The arm that you can think of that would be outside the definition of arm as you've defined it? Outside the definition of arm? No, Your Honor. I mean, I think... Machine gun? That's an arm. It's a firearm. It's certainly within the plaintext of the Second Amendment. Although I don't think we have law on that, that's open for challenge, then. It would raise Second Amendment scrutiny. I mean, I think Heller strongly suggests that the answer to that question is that it can be banned when it discusses M16 rifles, but that's a historical question. It would not be... The Second Amendment is implicated by that question, Your Honor. Of course. And so we have to run the Bruin analysis. And the only reason it's implicated is because it's covered by the plaintext of the Second Amendment. And so then when we get to the history, and that's where Bruin ceded this, that's where Heller ceded this question, the question is whether or not an arm is dangerous or unusual. As we've explained, an arm that is in common use, Heller says, is by definition not, but is instead protected. Common use? I mean, in popular use? Like it's common because it's popular, or common use for self-defense? It's common use for lawful purposes like self-defense, is what Heller said. So you discount illegal use, but if ordinary law-abiding citizens own the arms and use them for their protection, then they are certainly... And that's the case here. The Supreme Court just two or three weeks ago in Smith & Wesson said that the AR-15 is the most popular rifle in the country, and that all of these... For a Second Amendment, are those two words anywhere in the Smith & Wesson majority opinion? No, Your Honor, but this is a fact. They were talking about that as a popularity contest, not common use in furtherance of self-defense or lawful purpose, correct? But, Your Honor, the type of use that the Second Amendment specifically identifies in its text is keeping and bearing, right? So keeping and bearing is owning and having and carrying on your person for self-defense. If a person owns an AR-15, they're using it within the meaning of the Second Amendment. So I think... But all of them are using it for all purposes? Well, the Second Amendment... We have evidence in the record that says it's used for unlawful purposes. So you can't mean use in all ways, correct? That's correct, Your Honor. I don't include people who are using them unlawfully. But the 24 million Americans who own these are by and large not using them unlawfully. In fact, a minuscule percentage of rifles are ever used in crimes. So we know these are being used for lawful purposes, like self-defense, like target shooting, like sports, just like for possessing as an insurance in your home. Let me just... Judge Freeman has some questions for you. So you recognize that the Supreme Court has indicated that machine guns may be restricted as, I would say, more as stronger than, more dangerous than necessary for self-defense. But again, is that right? I don't recognize that it's because... Okay, tell me again what you said about... So the Supreme Court suggested that arms that are dangerous or said that arms that are dangerous are unusual. There's a historical tradition that allows them to be regulated, including by banning them.  It suggested that the M16 rifle, an automatic rifle, unlike the rifles we're talking about here today, was such a weapon. So it's not that it's more dangerous than necessary, it's that it's a dangerous and unusual weapon. Okay, it's a dangerous and unusual weapon. Yes. But it is your position that if the requisite number of Americans decided to use M16s for self-defense, then they could not be banned. So, Your Honor, I think you're assuming away the protection against that that Heller acknowledged, which is the American people's choices. The American people, just like Justice Thomas... How is that a protection? And I ask that because it strikes me that the common usage language, the common usage concept, is subject not only to market forces, but market regulation. But market manipulation, I'm sorry. In what sense, Your Honor? I'm not sure I'm following. If you buy... If one buys and sells weapons, how do they get out there into common usage? What if a better product comes along? A more lethal weapon comes along and somehow is successfully marketed in such a way that all of a sudden the AR-15 does no longer have the same level of popularity it had before. But the new, new, better, more powerful, more lethal AR-15 plus suddenly competes so well that the AR-15 is almost a dead letter on the marketplace. Isn't that a factor that plays into common usage, commonality? Seems to me to have a certain circularity to it analytically, but I can't quite get my hands around it. Well, I'd like to come back to the circularity, but first treat the point that if something better comes along and becomes popular, that is a feature of the common use test. That modern firearms should be popular and therefore protected is a feature of the Second Amendment. The point is to have Americans with the best tools for their self-defense, with the best acquaintance with tools that could be useful for their common defense. That is what the Second Amendment was designed to promote. I want to go back to following up with what Judge Freeman asked you about then. If the M-16 becomes popularly purchased through this market survey, and the Supreme Court has already said it's the kind of thing that can be prohibited. Are you saying that if enough Americans buy the M-16, it's no longer the kind of weapon that can be prohibited, regardless of how dangerous it is? Well, Your Honor, again, I would caveat this by saying that the American people had the opportunity for a long time to buy automatic weapons and they did not. I'm just, I'm asking you, I'm following up on Judge Freeman's questions. Yes. Assuming that there's the requisite level of purchase, whether it's $20 million, $25 million, as your colleague was saying, whatever the requisite number is to show common usage among the people of the United States. Is that enough to say now M-16s are no longer subject to regulation? Yes, Your Honor. If the American people buy a firearm in large numbers and decide it's useful to them, then it's protected by the Second Amendment. Now, again, I think these counterfactuals are not... Are there rights like that? That means, in your perspective, rights within the Constitution are limited only by their popular embracement. No, Your Honor. That's not my position. My position is that in the Second Amendment context, there's a historical tradition of banning dangerous and unusual. So you're saying that your, I just want to, I'm trying to make sure I understand, your position is limited only to the rights within the Second Amendment. Well, that's because this is a historical principle that is specific to the Second Amendment. The answer then is yes. Your position is it's limited to the Second Amendment. Yes, Your Honor. But it's not different from the way we do other constitutional rights in that we are always looking to the text of the Constitution and then what the historical principles are. I've asked you, my question is about popularity. It wasn't about the analytical framework. I'm with you. You look at the text and then now in the Bruin world, you look at the historical tradition. I understand the analytical framework. I'm asking you about popularity following up on my colleague's question to you. That's all. I'm not, I'm sorry, Your Honor, I'm not attempting to dodge your question. Yes, if a firearm is popular and in common use, then it is per se protected and cannot be banned. That's what Heller tells us. That's why the handgun is banned. Let me see if Judge Freeman has additional questions for you, Judge. Okay. Thank you, counsel. Thank you, Your Honor. You bet. May it please the court. Jeremy Feigenbaum for New Jersey. I want to answer Judge Smith's questions about what's in this case. Judge Schwartz's questions about where common use fits in this case. Judge Freeman's questions about what common use is and whether it's a circulation test. And then I think everyone's questions about the history and everyone's questions about machine gun. But before I go in that order, let me just say one thing. Five circuits have looked at these questions in the wake of Bruin, and they've all reached the same conclusion. Assault weapons laws and LCM laws are consistent with the Second Amendment, and they're consistent with the Second Amendment, both at step one, when it comes to this common use question, which is not a circularity circulation test, and at step two, because of our nation's historical principles, which Rahimi instructs this court to consider. And this court should join its unanimous five sister circuits in holding the same. So let me start with the unique question in this case about what arms are actually challenged here on the assault weapons question. So I think it's common ground that it's plaintiff's burden to specify what's actually in this case, whether that means to show what the relevant self-defense features are or whether that means to show circulation and to talk about what they're actually challenging here. And I think there continues to be at least some confusion across the briefing and at the podium this morning on that question, because although we all agree that the challenge doesn't necessarily only cover the Colt AR-15 and that they can cover AR-15s and the substantially similar features, which we join issue on in our briefing, they can't seriously mean that they're challenging every single thing stated in the statute, because they themselves in their briefing carve out the grenade launcher, for example. They specifically say they're not challenging that part of the guidelines. They say they're not challenging bump stocks at various points in their brief. And to give one example of something they don't specifically foreclose in their briefing, but we have nothing in this record to possibly support a challenge, there's the Stryker 12 street sweeper shotgun, which ATF prohibited as a destructive device in 1994. And they haven't given any evidence that since ATF itself prohibited it as a destructive device in 1994, that it is somehow even on their test proliferated sufficiently in the civilian market. So I heard my friends on the other side today. So given the carve outs that you just pointed out and that this is a facial challenge, what are we to do with that? So I sort of think the way Bianchi handled it, the Fourth Circuit on bunk opinion by Judge Wilkinson, which basically said it can't be a facial challenge to everything. They themselves are carving some stuff out. They can't mean to cover literally everything in the law. It can't be a facial challenge to everything. They definitely challenged the AR-15. They definitely did enough to clarify that and to some of the substantially similar features. And so we're joining issue here. And that's what Bianchi did, too. So it does a full merits opinion, I think, a very effective merits opinion at both step one and step two. But it ultimately focuses on the AR-15. And is that how we should handle this case? Because that's really not what I understand to be argued by your friends on the other side. So even this morning, it ends up the result ends up being rather different from how the case or cases were originally pled. And one would have expected to have moved through the process. I take the point judgments. Well, obviously, at summary judgment, this wasn't a motion to dismiss. And sometimes cases develop from the way they're initially pled to how they land at summary judgment. You know, they sort of complain that the district court looked at the way we had responded, mostly focusing on the AR-15 and therefore focused on the AR-15. But that's not exactly right. We're obviously responding to the case that we think we have against us. And if we had incorrectly responded to what the challenge was, you'd expect on reply they would have said in the district court, they're missing everything. They forfeited everything. But that's not what they were saying here. And I think that would be forfeiture of forfeiture. But that's not even the point. The point is, Judge Sheridan, I'm not saying was right to just look at Colt AR-15 as opposed to the AR-15 and the substantially similar features. But I don't really understand how it's quite fair to fault Judge Sheridan to this degree. But in all events, if this court has questions, I think we could do what I was just saying in a colloquy with Judge Freeman, which is to say, well, like in Bianchi, we don't quite have a facial challenge to everything. Some of these things are banned by ATF. Some of these things plaintiffs themselves are taking out of the challenge, like grenade launchers, like bump stocks. But we'll focus on what's really in front of us. And what is that?  What is in front of us? Just Colt AR-15, AR-15s and similar devices based upon the statute's definitions. Yeah, I think the AR-15 and the substantially similar features to the AR-15 from the guidelines. Now, to be clear, and I think that largely tracks what Bianchi was looking at in the Fourth Circuit. If this court... Just one pause on Bianchi. And I know that throughout your briefing, you've really pointed to Bianchi as like the model, it seems, of how to deal with this. But the Bianchi majority opinion, it starts and it ends with what looks a lot like the means and scrutiny that we were told not to apply. So the reason I think Bianchi is particularly helpful is that it does a fulsome analysis at both steps. But frankly, I think a step to analysis on historical tradition is done very well across all five of the sports sister circuits. Hansen in the D.C. Circuit does a nice job with it. OSD in the First Circuit. But was Judge Freeman's question correct? In fact, was the criticism that she referred to that I think actually appeared in one of the accompanying opinions from the Fourth Circuit correct? That it really takes us back to the means and scrutiny that we were applying previously. So I don't think so in two respects. So there's two questions that I think are before this court as a matter of legal test. The first is, everyone agrees there's a common use tradition. We obviously have a big disagreement about what it means. We think common use is specifically about comparing the features of the arm to common real world uses of self-defense. That's not a means and scrutiny. You do still have to look at some factual information about how self-defense operates to understand what would be in common use. I've understood the common use approach that has been argued so far by your friends on the other side as being some undetermined numerical factor. One which has not been defined, but which somehow presents an obvious base from which one can thereby infer commonality of that particular weapon. Am I misunderstanding them? You are understanding their position correctly. That is not my position about what common use means. But I think you're understanding them correctly. Tell us what the government, what the state of New Jersey says common use means in this context. And why is it step one? So we think that what common use means for self-defense is that you actually have to look at the objective features of the arm and compare it to common uses for self-defense. So LCMs illustrates this well. If it were the case that common self-defense involved firing 12 bullets in a regular common respect, then you would understand why LCMs would be in common use for self-defense. Because you'd look at what the feature is, you'd see how self-defense works in the real world, and you'd compare the two. What we have on this record, obviously, is that on average, you have two to three shots in self-defense. It's only 0.3%, less than 99.7% of time. You'd be firing 10 shots in self-defense. This is the Allen Declaration. I think it's hard to say that that's common use for self-defense. So you look at what self-defense looks like in the real world, and then you compare it to the actual item in front of you in an objective way. Because the contrary way to think about common use, and I'll get to the step in just one moment, but the contrary way to think about what common use is, this sort of circulation test that I took my friends to be pressing again this morning, it doesn't quite hold for a couple reasons. I think the first problem is that it's fundamentally ahistorical. So the Bowie knife example, to take, I think, maybe the most obvious example on this score, the Bowie knife example involves 42 states restricting it, including bans on manufacture, on sale, on possession, all after there was quote-unquote a craze for Bowie knives, and they got really popular, including in dueling. And I think the history of American regulation is that once something penetrates the civilian market, once it circulates to a greater degree, the legislature understands the public safety problem that emerges as a result for Bowie knives. It was dueling for large-capacity magazines and assault weapons, it's mass shootings, and it responded seeing that particular public safety threat. But there are other problems inherent in the circulation test. The first is, Judge Smith, since you brought up the Bowie knife issue and its historicity, is that the best you've got for purposes of Bruin step two? So it's one of my favorites. I don't think it's my only favorite. What I like so much about it is a couple of things. It did involve undisputed bans on possession, it involved bans on manufacture and sale, it involved prohibitive taxes, it eventually involved policy responses by 42 states, and it's as early as 1837, which is only a year. My understanding was that only a minority of the states actually passed outright bans on the Bowie knife. Yeah, so just to be clear, our position is not that any state has to ban LCMs or assault weapons, and it didn't have to ban Bowie knives in the early 1800s either. Our point is that there's policy variation. And what's missing in this case that's so different from Bruin, because Bruin was a case where they said, well, there aren't too many examples like this. And there were counterexamples, which was so important in Bruin. There was contrary evidence of unconstitutionality. We don't have any evidence of unconstitutionality. The only case my friends cite on Bowie knives, they say cuts the other way, is the Nunn case from Georgia. And that was about carry of pistols that had nothing to do with Bowie knives. And so without countervailing evidence, we'd run into the problem that this court rejected in Pizzolittis, and Justice Barrett rejected in her concurrence in Rahimi, which is this idea of use it or lose it legislative authority. The fact that others responded with carry restrictions or taxes instead of a manufacturer ban, a sale ban, a possession ban, doesn't mean states couldn't include those bans, and a number of them did, and none of them were invalidated. Just to get back to your point about common use, and you said you have a declarant who says, you know, generally self-defense requires two or three shots from a firearm. And so it sounds like your position is that arms can be prohibited if they are more lethal or more dangerous than necessary for what is commonly used for self-defense. But we would all acknowledge that, you know, you could use a magazine with 10 bullets. You could use a magazine with 30 bullets and still fire two or three shots. So I take it that the challengers, the plaintiffs here, are saying whatever they're using, whatever device, whatever arms they're using to fire those two or three shots are the commonly used firearms for self-defense. So why should we then, you know, take away those last 20 bullets from the 30-bullet magazine? So I think this is a great question for teeing out the difference between our objective test and their subjective approach. Ours is not how often does it happen to be an AR-15 that you've kept in your bedroom that you use in that instance. You look at what self-defense looks like in the real world. So how often, for example, do you need to shoot an attacker 500 yards away? The answer from the record is you don't. That's not what real-world self-defense looks like. So it might be that someone subjectively chose to keep an AR-15, and therefore subjectively that's closest to them when they need to use it in self-defense. But it doesn't have the relevant features that would protect you in common real-world self-defense. So you're looking at the objective features compared to real-world self-defense. I use LCMs as the example to show it because the problem with the views on the other side is you get into the subjective preferences thing that I think the colloquies have shown this morning is entirely circular and leads to this weird, like, flood-the-zone arms race between a manufacturer trying to put out as many of a particular item as quickly as it can and legislatures that have to restrict it before they even have enough information about the danger. So the district court is supposed to say, well, because some of the, you know, the AR-15 is really big and smaller people can't handle it and, you know, and you can't use your, you know, use it with one hand and use the other hand to call the police. Like, so for all these reasons, that's inappropriate for self-defense. Those are the, like, factual findings that you think the district court needs to make. Yeah, so I think there's legal questions and then there's factual applications. I think this is really important. I think that it is entirely up to courts in the first instance to figure out what the legal framework is without looking at the expert evidence, et cetera. So we think the legal framework is ultimately what are the objective features of the item and how does it compare to common real-world uses of self-defense. The same is true when it gets to the step two historical analysis where we're looking for what are the features of the item that make it disproportionately contribute to a particular real-world public safety threat, whether that's Bowie knives and dueling or LCMs and assault weapons and mass shootings. Those are the legal frameworks that are historical tradition and the plain text and original public meaning all set for this court. Then there are going to be questions, of course, of application. Any test you adopt, you're going to need application. They want district courts to make factual findings on circulation of the item. We want district courts to make factual findings based on expert testimony over whether and how self-defense is practiced and what features do or don't lend itself that way. Because a contrary rule doesn't even square with what we know is true about machine guns, to take one obvious example. There's 176,000 machine guns in civilian circulation right now. Justice Alito's concurrence in Catano talked about 200,000 stun guns. Unless there's like this magic gerrymandered number between 176,000 and 200,000, which is where this per se dispositive constitutional protection comes in, then the very result that Palmetto forecloses and the very result that Heller said is startling would actually inexorably follow from my friends on the other side position. But I don't think that quite makes sense in the real world of machine guns because they obviously have a bunch of objective features that are entirely unnecessary for self-defense and are obviously disproportionate and create this sort of unusual danger to your questions about dangerous or unusual and dangerous and unusual, Judge Freeman, you were asking earlier. I think those colloquies were quite important and machine guns are a very useful illustration here, too. Because as the D.C. Circuit put it in Hanson, which I think is a very helpful opinion in talking about dangerous or unusual, as every member of this court has recognized this morning, all guns are going to be dangerous. So it can't be that you really have a dangerous and unusual as two completely different precommitments. So am I remembering your brief incorrectly that there was a suggestion that was what is reasonably or was reasonably intended was rather unusually dangerous? That is our view. Yes. That it is unusually dangerous, like necessary and proper. So unusual has been turned into an adjective for dangerous. Yeah, we have necessary and proper, nice and toasty. I mean, there's a couple of ways in which you're not saying the room is nice. You're not saying anything about the aesthetic of the room. I prefer nice and cool. But fair enough, fair enough. But you wouldn't be saying, you know, it's nice because you have your favorite color on these walls and then it's also cool because of the temperature. And so in all events, we think it is a grammatical formulation. But I think Judge Freeman's points earlier are really, I think, on point here, which is both the precedents and historical sources say dangerous and unusual and dangerous or unusual. And that's a pretty odd way to create a two-step test that you have to always meet. And the way my friends this morning at the podium suggested that unusual and danger are hooked together was that you'd have to ask if it's dangerous compared to something that has already circulated. But you've already gone through that on unusual. So that just collapses the inquiry back into usual again. Because if you are usual in the way they use it, meaning you've circulated, if you've already circulated, you'll never be dangerous in comparison to something that's circulated because it itself is circulated. So the whole thing collapses into itself once again. And you get into this popularity contest that has this arms race between legislatures and manufacturers. Circularity, a machine gun problem, is ahistorical, is not how we do any other constitutional right, and isn't how Heller handled machine guns. Heller didn't count machine guns. Miller didn't count short-barreled shotguns. Palmetto didn't count machine guns. Heller didn't even just do a counting exercise on handguns. So I just have a hard time with the counting exercise, really squaring. And instead, one path is for this court to say common use is at step one. That's what the Fourth Circuit in Price explains. That's where Bruin put it when it says arms in common use are those that get Second Amendment protection rather than is the dispositive constitutional test. And why is it step one? So it's step one for two reasons. One, I agree with my friend that you look to the precedent in the first instance to figure out where it goes. And if you look at pages 32 and 33 of Bruin, page 32 talks about the various things that get Second Amendment protection, the people, arms in common use for self-defense, and then it talks about doing a historical analysis. I also think that's consistent with how constitutional rights typically work. You look at what falls in the actual scope of the right based on its original public meaning. So a unanimous jury, even though the Sixth Amendment only says jury. Child pornography falls outside the First Amendment, even though it is literally speech. And then you go at the second step to whatever the test is. Down step one for a sec. If it's common use in self-defense, as Bruin says, and you say that's step one, in order for us to make that analysis, we've got to go outside the text to figure out whether it's a common use in self-defense and consider some of the statistics you just noted. Am I understanding your argument? Sort of. So let me just explain in more detail what I mean. I don't think you go outside the text. You use sources of original public meaning to understand the text. So Bevis in the Seventh Circuit talks about this in some detail. And in that case, everyone agrees the right to arms, the right to arms, the right to keep and bear arms, has a pre-existing meaning. And that pre-existing meaning has to be its original public meaning. We understand that.  Exactly. Because that comes from the English Bill of Rights. That comes from nine state constitutional provisions. That comes from Blackstone. And so you understand all of that together. The textual right to arms is what everyone would have understood the right to arms to mean, which came with the arms in common use for self-defense. So then we'd have to determine whether the arm being challenged is in common use for self-defense. Exactly right. That would be the application. And that's the application. That would be the application. Exactly. So as a legal matter, you look to the text and its original public meaning to get the test. And then as with any test with an arm or as in any test with what have you that might be covered, public area, etc., you have to then apply it to the law in front of you. And that's true whether you're at the first step where you're looking at what's the legal test for what falls within the original scope or at the second step where you're looking at the historical tradition. And if I could just say one last thing on this because I think this is helpful for all these questions, I'm not sure the court has to decide if it's first step or second step for common use because at the end of the day, we have a bit of a legal dispute. I think the most important point, and we have a legal dispute about sort of what it means, the only real difference on whether it goes to first or second step is going to be the burden shifting. But burdens is about when you've joined issue on a legal test and you're trying to apply it. No one gets a burden or not on what the legal answer is. And if it's not a circulation test, if it's the test in the way we've described it, then they definitely, I'm not sure who bears the burden is really going to matter in this case because we have this legal dispute. Well, there is a burden when we get to this, if we get to the second step, correct? No question. So let's talk about the second step. The analogies that the state has brought to the court's attention, some prohibit just carrying, others prohibit the firearm in its entirety, not firearm, but the weapon in its entirety, possession. We are supposed to glean principles from historical regulations. What can we take from the principles of laws that dealt with prohibitions on carrying when the New Jersey statute is an outbreak ban? So two quick points, one on the premise that got us to this question, and then one on the question itself. Just on the premise to close the loop, even if common use is step two, my point is it's not the exclusive step two historical test. You'd still be doing this broader historical tradition, looking at a record that never went in front of Bruin, never went in front of Heller, but is in front of this court now. And what over and over regulations from crossbows in English period to trap guns at the founding, to Bowie knives as early as 1837, to slung shots right on through machine guns. When you look at the aggregated information from our history together, you glean the same principle over and over, which is that once an item circulates efficiently into the civilian market, such that it is clear it's a disproportionate threat to a particular public safety problem, again, whether that's dueling, whether it's mass shooting, the problems change as time goes on. Once you have penetration and circulation to the civilian market with a disproportionate public safety threat, the legislature is free to respond to that item, while of course leaving open plenty of other items for self-defense. And I think that's what we see over and over. It's never been that the state, the United States, any state, is able to shut down arms entirely. It's always been pretty targeted to particular weapons that pose a disproportionate threat. Sometimes it's carry, sometimes it's taxes, sometimes it's manufacture, which is pretty close to possession, because if you can't make it, you're not going to be able to possess it. The same with sale. Sometimes it's sale, sometimes it's possession itself. But of course— They all give us the same principle, which is if there is a— the principle taught from your point of view from all of these regulations is if the item poses a threat to public safety, there's a historical tradition of regulating— Yeah, I think a disproportionate public safety threat. Obviously, all arms are posing some public safety threat in the wrong hands, so we don't think that that alone is going to be enough. I think Hanson, again, is particularly helpful in that. This gets to the unusually dangerous point that we were talking about earlier, because otherwise, I don't even see how you could have a ban on machine guns at the amount we've already had in circulation here. But we certainly know we can, because some items are dangerous enough. I think, you know, I hear you on the disproportionate public safety threat and sort of tracing that historical line, but when in very recent history, we have the Supreme Court saying, look to common use, like, you know, disproportionate public safety threat and common use, it's hard to see those overlapping. So I think a couple of points on that. So the first, and I think most important point, is that Heller and Boone made clear they were not intending to do an exhaustive historical analysis on restrictions you could have. And Heller, of course, says this isn't promised to have any arms for any purposes whenever you want. And so none of the courts have ever looked at this historical evidence. They've asked you, in the first instance, to look at the historical evidence that parties put into the record and figure out what the principles are. The second thing is that I really do read Bruin to be saying that common use is for the arms that get protection. Again, it's page 32. This is what the Fourth Circuit says in Price. And if that's the arm that gets protection, then you figure out what restrictions you're allowed to have on that arm. Can you have a carry restriction? Could you have a tax on that? Could you have an outright possession prohibition on that item? And when you look at the history, there's always been a range. And so this gets back, I think, to this court's recent decision in Pizzolittis and to Justice Barrett's concurrence in Rahimi, which is all about the ways that we've always had policy variation in this country, but it's never been a use it or lose it. What you look for is overall traditions to see what are the principles from different policy responses. Look at Rahimi itself. It looks at a surety law, and it looks at a going armed law, and it supports a ban on individuals possessing arms based on their danger. I mean, Justice Thomas in dissent is saying those things are not dead ringers at all. Those things looked really different, going armed, posting a bond versus a possession ban under 922G for certain individuals posing danger. But Rahimi had no trouble identifying that historical tradition. I think our historical tradition is at least as tight, if not tighter than when we saw in Rahimi, plus you combine that with the fact that we're dealing with unprecedented development in technology. About the large capacity magazines, the state is taking the view that it's not an arm at all. It's more of an accoutrement because it's not, in and of itself, capable of causing injury. Let's assume this court were to determine it is a critical component for certain arms to operate, certain weapons to operate. How is the large capacity magazine, like the analogs you've mentioned, the club, the Bowie knife, this long shot? Yeah, I think LCMs very much fits. When I'm talking about the historical tradition, I very much mean to sweep in assault weapons and LCMs. I think that's true for common use. I think it's true for our broader historical principles as well. I think the easiest way, the way most circuits have handled this question is to look at the broader historical tradition, like OSD did, like Hansen did, and say LCMs, just like assault weapons, fall neatly into that global historical tradition. They haven't said the only historical tradition is common use, although the courts that have looked at it said they fall outside common use as well. But they haven't said the only historical tradition is common use, they've looked at the history, they've gleaned principles from the history like Bruin and Rahimi instruct, and then they've applied that to assault weapons and LCMs in equal measure. And all five circuits that have looked at a mix of assault weapons and LCMs, lots have come out the same way because the historical record built in these cases has a pretty consistent through line. I understand my friends quibble with a piece of evidence here, a piece of evidence there, but we're talking about English period to the founding to 1837, which is just a year later than the 1836 evidence Rahimi was relying on, on to antebellum, on to reconstruction, on to machine guns, on to restrictions on semi-automatics at 12 capacity in the 1920s. So over and over we're seeing the same through line in our historical tradition and every circuit has seen it the same way. Okay, thank you counsel. Thank you. Thank you, just a few brief points. First on the question of where common use begins, I think the argument you just heard is exactly the argument that this court has already rejected in Lara and Range as conflating Bruin's two distinct analytical steps. What the state is saying is in order to do the textual inquiry, we have to do all the historical analysis first. If that's how this worked, you'd never get to the historical tradition. The state would never bear the burden that Bruin said over and over and over again, states bear when they regulate arms bearing, regulate arms bearing conduct. Do you agree though with the state that it kind of falls out? I mean, I recognize burden, the burden is important in many contexts, but ultimately if the question is common use, whether we do it at step one or whether we agree with you and we do it at step two, aren't we probably gonna land in the same place? I don't think so. I mean, to give you a perfect example, just to come back to a disputed issue in this case, I mean, there's arms that we challenge here. If you look at pages 33 to 36 of our brief that we put on a case about that are unquestionably firearms. At that point, the burden shifts to the state to explain why the shotguns it has banned, it can ban. The pistols it has banned are things that it can ban. If the state decides we're gonna do none of that, we win, it's their burden. So it is something that matters. But at the end of the day, yes, the work has to be done one way or another. And that is my second problem with the state's view here, which is that they wanna deride common use as a popularity test, but make no mistake, what they're really saying is they think the right way to do this inquiry is that legislators and judges who may have very little familiarity with particular types of arms and the needs of people for self-defense should be able to say tens of millions of Americans have just made the wrong choice about what they actually keep and use for self-defense because they want the test to be not what is in common use, but what they think should be in common use. And that is exactly the tradition that we have rejected throughout the history of our founding generation. Our founding generation believed it is not for the government to tell the people what they do and do not need to keep and bear for their own self-defense. Finally, I take the state's, I think they suggested that Bowie knives are their best historical evidence of this tradition. Let's talk about Bowie knives. That he likes that one. I think he said it was his best one. It's certainly his lead one. There were... In fact, I found, I liked that one a rather curious response, but we don't have Sir rebuttal here, so... Sure, but the Bowie knife is something that was never prohibited. Their only example of a law that they think prohibited it was Georgia. I encourage you to look at the law and the Nunn decision, which explains it wasn't prohibited. It was actually a concealed carry ban because the first section of the statute says they're prohibited, and the fourth said you don't violate the first statute if you carry it openly. So there was not one prohibition on the possession of Bowie knives, and I think that proves our point, not theirs, because what they say is this is something people were really worried about. It proliferated, and the answer was we're going to regulate concealed carry. We're going to have enhanced penalties for the use of this arm in a crime. We're going to regulate it that way, but we're not going to go to possession bans because that is an extreme measure that Heller teaches... How do you respond to your adversary's point that Rahimi used the surety and the go-and-carry laws to support, in that case, the prohibition of possession? So that seems... I'd like to see how do you get around that? Yeah, because the tradition that Rahimi recognized and the distinction it drew, the reason it said those same laws, they're actually the same laws that Bruin said were not historically relevant analogs in Bruin, but were in Rahimi. And the reason Rahimi said they were different is because the tradition it drew was a tradition of keeping arms out of the hands of people who have been proven to pose a danger to the public, which Rahimi contrasted... The determination of fact was very important in that case. ...a determination of fact about individualized, determination of fact, which it contrasted and said that's the reason that's different from Bruin is because Bruin was a law that restricts the right of the general population to carry. We have said Bruin is a carry case, Rahimi is a person case. Correct, and Bruin said that these same laws, these same Bowie knife laws, these same laws that they're pointing to here, weren't even sufficient to support a ban on carry. You're saying Rahimi made that conclusion? Bruin made that conclusion, that they couldn't even support a ban on carry because they were only concealed carry bans. Ah, for Chiari, those same laws can't support a ban on possession. Let me see, Judge Rahimi, thank you. Judge Smith. Counsel, thank you very much. Thank you. The court appreciates everyone's hard work on this case and your very helpful arguments. The court would ask that a copy of the transcript be prepared and we ask the sides if you could split the expense of that, please. And the court will take the matter under advisement. I think you got it. Okay. We good? Because we have elections this next year. We good? Okay.